IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-985

Filed 2 January 2024

Watauga County, No. 19 CRS 50415

STATE OF NORTH CAROLINA,

v.

TRISTAN NOAH BORLASE, Defendant.

Appeal by defendant from judgment entered 3 March 2022 by Judge R. Gregory Horne in Watauga County Superior Court. Heard in the Court of Appeals 20 September 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General Heidi M. Williams, for the State.*

*Law Office of Lisa Miles, by Lisa Miles, for defendant.*

DILLON, Judge.

Defendant Tristan Noah Borlase was convicted of two counts of first-degree murder for killing his parents one month before turning eighteen years of age and was sentenced by the trial court to two life sentences without the possibility of parole, to run consecutively. He appeals his sentence. For the following reasons, we conclude Defendant received a fair trial, free from reversible error.

I.     Background

On 10 April 2019, Defendant brutally killed his father and mother in separate attacks at their home near Boone. Evidence at trial showed as follows:

On the morning of 10 April 2019, Defendant attended his Civics and Economics class at school. The lesson that day focused on how juveniles are punished differently than adults in the criminal justice system. Specifically, the lesson instructed that juveniles could not receive the death penalty for murder.

In the afternoon, Defendant's father surprised Defendant by picking him up from high school after receiving a call from school personnel informing him that Defendant's grades had been slipping and that he was at risk of not graduating. Once home, Defendant's parents informed him that they were disciplining him by taking his car keys and cell phone and by prohibiting him from participating on the school's track team for the remainder of the season, including participating in the track meet that afternoon.

Later that evening, Defendant was inside the home with his mother while his father was outside engaged in yardwork. While alone with his mother, Defendant inflicted multiple stab wounds on her with a large knife. He also inflicted blunt force injuries on his mother and strangled her. He then went outside, approached his father from behind, and inflicted a stab wound. He chased and subdued his father, riding his father's back until he fell to the ground, and inflicted several more stab wounds in a violent fashion. When he finished the attack, he walked away with his father still alive. He looked back towards his father and saw him on his knees,

struggling to get up. His father then collapsed to the ground, and Defendant continued to walk away. He did not render aid to either parent.

Defendant spent the next two hours attempting to conceal his actions, hiding the bodies of his deceased parents and attempting to clean the crime scene. He hosed down the front porch and the living room area. To dispose of his mother's body, he tied a rope around her feet to drag her from the house. When this was unsuccessful, he resorted to carrying her, but he repeatedly dropped her. He hid his mother's body in the bed of a pickup truck, under a blanket and bags of mulch, in the woods on the family's property. He stole his father's wallet from his body but left the body in place and covered it with a hammock (which his sister would find later that night while searching for her parents).

Defendant then drove to his grandmother's home to pick up his youngest brother, rather than requiring his grandmother to bring his brother home. That brother described Defendant as "overly happy" and "kinda upbeat" when Defendant picked him up. The grandmother described Defendant as being "just in a really good mood" and said that he "smiled and laughed a bit."

After bringing his brother home, Defendant then left to smoke marijuana with friends, leaving his twelve-year-old brother alone and scared in a home covered with blood, worried about his missing parents. As he was returning home a few hours later, he saw his grandmother's car, whereupon he turned off his headlights and drove away. He stayed at a friend's house overnight and attempted to flee the state

the next morning but was caught shortly after crossing the border into Tennessee.

At the time of the killings, Defendant was 17 years, 11 months old, a senior in high school, and had been accepted to attend a state university in South Carolina, with plans to join the school's track team as a pole vaulter.

While in jail, Defendant repeatedly showed a lack of remorse for his crimes. And a few weeks after the killings, Defendant even hosted a birthday gathering for himself, with his friends attending, at the jail.

Approximately three years later, on 2 March 2022, a jury found Defendant guilty of two counts of first-degree murder based on premeditation and deliberation.

The following day, on 3 March 2022, the trial court held a hearing to consider the appropriate sentence, as Defendant was a minor when he committed the two murders. At the conclusion of the hearing, the trial court entered a written sentencing order with its two judgments, sentencing Defendant to two life sentences without the possibility of parole, to run consecutively. Defendant appeals.

II.     Analysis

Defendant's sole argument is that the trial court erred by sentencing him to two consecutive life sentences without parole. In making his argument, Defendant contends that the trial court did not comply with Section 15A-1340.19B of our General Statutes, which provides the procedure for considering a sentence of life without the possibility of parole ("LWOP") for a juvenile offender. He further contends that he was sentenced in violation of the Eighth Amendment to the federal constitution and

- 4 -

Article 1, Section 27 of our state constitution.

  A.  Federal Constitution – Eighth Amendment Jurisprudence

   In the present case, the sentencing judge held a hearing in which he heard evidence concerning Defendant's youth and upbringing. The judge exercised discretion and determined two consecutive sentences of LWOP to be appropriate. For the reasoning below, we conclude the procedure employed in sentencing Defendant conformed with the Eighth Amendment of the federal constitution.

   The Eighth Amendment to our federal constitution bars the imposition of "cruel and unusual punishments." U.S. Const. amend. VIII. The Eighth Amendment applies to states by virtue of the Fourteenth Amendment. *See Harmelin v. Michigan*, 501 U.S. 957, 962 (1991).

   A LWOP sentence is "the second most severe [punishment] known to the law." *Id.* at 996. But as a LWOP sentence is markedly different than a death sentence, *Furman v. Georgia*, 408 U.S. 238, 306 (1972), a LWOP sentence is permissible under the Eighth Amendment for *adult* offenders, even for many non-violent crimes, such as simply possessing a large amount of cocaine, *Harmelin*, 501 U.S. at 996, and may be imposed on adult offenders even without ever considering mitigating factors or the "particularized circumstances of the crime and of the criminal." *Id.* at 962.

   However, the United States Supreme Court has determined that the Eighth Amendment is more restrictive on the ability of a trial court to impose a LWOP sentence on a defendant who was a minor when he committed his crimes. For

instance, in 2010, the Court held that the Eighth Amendment bars the imposition of a sentence of LWOP for a juvenile *nonhomicide* offender. *Graham v. Florida*, 560 U.S. 48, 75 (2010).

In 2012, the Court held that a sentencing scheme which *requires* a sentencing judge to impose a LWOP sentence on a juvenile homicide offender violates the Eighth Amendment. *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (holding that "the Eighth Amendment forbids a sentencing scheme that mandates [LWOP] for juvenile offenders."). In so holding, the Court reasoned that a sentencing scheme must afford a sentencing judge or jury "the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489. The Court quoted earlier cases to reiterate the "great difficulty [for the sentencing judge] of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender *whose crime reflects* irreparable corruption.' " *Id.* at 479 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2004), and *Graham*, 560 U.S. at 68) (emphasis added).

Four years later, the Court explained that *Miller* "drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Montgomery v. Louisiana*, 577 U.S. 190, 209 (2016).

Courts across our country have grappled with the proper interpretation of these decisions, specifically whether or not the Eighth Amendment prohibits a judge from sentencing a juvenile homicide offender to LWOP without expressly finding that

the offender was permanently incorrigible (or at least that his crime reflected incorrigibility). *See Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021) (recognizing a "disagreement in state and federal courts about how to interpret *Miller*").

In 2021, in *Jones v. Mississippi*, the Court clarified that the Eighth Amendment does not require a sentencing judge to make any finding regarding the juvenile offender's permanent incorrigibility or otherwise to provide a "sentencing explanation with an implicit finding of permanent incorrigibility" before imposing a sentence of LWOP. *Id.* at 1318-19, 1321. Rather, the Eighth Amendment merely requires that the sentencing judge be afforded the "discretion to consider the mitigating qualities of youth and impose a lesser punishment." *Id.* at 1314.

In the present case, the sentencing judge held a hearing, considered evidence concerning Defendant's youth, and in his discretion determined two LWOP sentences to be appropriate. The procedure employed by the sentencing judge met the requirements of the Eighth Amendment as articulated by the United States Supreme Court in *Jones* and was at least as robust as the procedure employed by the Mississippi judge in *Jones*, which that Court held to be constitutionally sufficient.

Specifically, in *Jones*, the trial court held a hearing, allowed the defendant to introduce "any evidence relevant to the factors discussed in *Miller*[,]" including five factors touching on the defendant's youth, his upbringing, the circumstances of the offense, his competence, and the possibility of rehabilitation. *Jones v. State*, 285 So.3d 626, 632-33 (Miss. Ct. App. 2017), *aff'd*, *Jones v. Mississippi*, 141 S. Ct. 1307 (2021).

The judge made an oral ruling in which he "did not specifically discuss on the record each and every factor mentioned in the *Miller* opinion," but in which he did state that he "considered each of the *Miller* factors." *Id.* at 634. In sum, he "recognized the correct legal standard ('the *Miller* factors'), his decision was not arbitrary, and his findings of fact [were] supported by substantial evidence." *Id.*

In the present case, the sentencing judge entered a written order in which he considered similar factors with much more articulation as to each factor than that provided by the sentencing judge in *Jones*. He exercised discretion to determine an appropriate punishment. His decision was not arbitrary. And for the reasoning in the next section, we conclude his findings are supported by substantial evidence. Accordingly, we conclude the sentence does not violate the Eighth Amendment.

## B. North Carolina's Sentencing Scheme

In 2012, in response to *Miller*, our General Assembly enacted a statute which affords a judge discretion whether to sentence a juvenile homicide offender to LWOP. *See* N.C. Gen. Stat. § 15A-1340.19B (2022). The statute requires the sentencing judge to hold a hearing and allows the State and the defendant to present evidence "as to any matter that the court deems relevant to sentencing." *Id.* § 15A-1340.19B(b). The statute also allows a defendant to offer evidence of mitigating factors, including, but not limited to, eight specific factors which touch on the defendant's youth. *Id.* § 15A-1340.19B(c). Our Supreme Court has held that this

sentencing scheme "facially conform[s] to the federal constitutional case law." *State v. Conner*, 381 N.C. 643, 666, 873 S.E.2d 339, 354 (2022).

It may be that our sentencing statute provides more limits than that required by *Miller* and *Jones*. However, as stated in *Jones*, states are free to impose "additional sentencing limits in cases involving defendants under 18 convicted of murder." *Jones*, 141 S. Ct. at 1323.

We now turn to Defendant's contentions in his brief on this issue.

*1. Permanent Incorrigibility and Potential for Rehabilitation*

Defendant challenges that the evidence did not support the trial court's finding that he was "permanently incorrigible" and "beyond rehabilitation." We note that there is nothing in our sentencing statute which requires the trial court to expressly find a juvenile homicide offender to be permanently incorrigible in order to sentence him to LWOP; however, the statute does require the sentencing judge to consider the "[l]ikelihood that the defendant would benefit from rehabilitation in confinement." N.C. Gen. Stat. § 15A-1340.19B(c)(8). In any event, here, the trial court determined that his "crimes and other [behavior] demonstrate a condition of irreparable corruption and permanent incorrigibility without the possibility of rehabilitation." We conclude the trial court made several findings supporting its determination and that these findings are supported by the evidence.

Specifically, the trial court made extensive findings concerning Defendant's crimes, his intelligence, his devious calculations made during the crimes, his lack of

sincere remorse for those crimes, his manipulative behaviors during and after his crimes and other behaviors, and other relevant factors to determine that there was insufficient evidence concerning the statutory mitigating factor of the likelihood of rehabilitation. While Defendant argues that "the record as a whole" suggests otherwise, our review is not a "whole record test" review. The trial court considered all the evidence, and there was substantial evidence to support the trial court's determination.

### 2. *Defendant's Age*

The statute requires the trial court to consider evidence concerning the offender's "[a]ge at the time of the offense" as a mitigating factor. N.C. Gen. Stat. § 15A-1340.19B(c)(1). Here, the trial court found Defendant was one month shy of his eighteenth birthday when he murdered his parents. Defendant takes issue with the failure by the trial court to indicate in its order whether it considered Defendant's age to be a mitigating factor. We disagree. Though the trial court did not expressly state that it did not consider Defendant's age to be a mitigating factor, it is apparent from the section in the order concerning Defendant's age and from the order as a whole that the trial court did not consider Defendant's age as a mitigating factor. For example, the court pointed out that Defendant "reached the age of adulthood only one month after committing these homicides." Accordingly, we conclude that the trial court did not err in its consideration of this factor.

### 3. *Immaturity*

The statute requires the trial court to consider evidence concerning Defendant's "[i]mmaturity" as a mitigating factor. N.C. Gen. Stat. § 15A-1340.19B(c)(2). Defendant takes issue with the trial court's handling of this factor. The trial court gave some weight to Defendant's immaturity as a mitigating factor but did not find the factor "to be a significant mitigating factor[.]" In so determining, the trial court recognized that juveniles in general are immature but that there was no evidence to suggest that Defendant was more immature than someone of his age. We conclude that the trial court did not err in considering this factor.

### 4. *Ability to Appreciate Risks and Consequences*

The statute requires the trial court to consider evidence concerning Defendant's "[a]bility to appreciate the risks and consequences of [his] conduct" as a mitigating factor. N.C. Gen. Stat. § 15A-1340.19B(c)(3). The trial court found no mitigating value as to this factor, noting Defendant's actions in planning the murders, his attempts to cover up his crimes, and his flight from the crime scene. Defendant merely notes in his brief concerning this factor that his attempt to clean up the crime scene was sloppy at best. Nonetheless, we conclude that the trial court did not err in its consideration of this factor.

### 5. *Intellectual Capacity*

The statute requires the trial court to consider evidence concerning Defendant's "[i]intellectual capacity" as a mitigating factor. N.C. Gen. Stat. § 15A-1340.19B(c)(4). The trial court found Defendant's IQ to be 128 (placing him in the

97th percentile) and that he had no intellectual limitations and, accordingly, determined Defendant's intellectual capacity not to be a mitigating factor. Defendant argues that the trial court should have considered Defendant's high intellectual capacity as a mitigating factor. We conclude that the trial court did not err in its consideration of this mitigating factor.

### 6. *Familial or Peer Pressure*

The statute requires the trial court to consider evidence concerning "[f]amilial or peer pressure exerted upon [D]efendant" as a mitigating factor. N.C. Gen. Stat. § 15A-1340.19B(c)(7). Concerning this factor, the trial court found that Defendant had a positive home environment with loving parents and did not experience any significant peer pressure. There was evidence to support this finding. For instance, Defendant's forensic psychologist testified regarding his conversations with Defendant about his father. In those conversations, Defendant "talked about wanting to be like his father and that his father was a role model for him. Talked about how his father taught him how to play the guitar, and how proud his father was, how proud he was when he came to his track meets and would put his arms around his son." During his testimony at trial, Defendant characterized his mother as "a good mom" and "understanding[.]" One of Defendant's sisters testified that their mother had a "soft spot" for Defendant.

Defendant points to evidence suggesting that his relationship with his parents was strained, causing him emotional harm. The trial court did note that Defendant

disagreed with some of the decisions his parents made concerning discipline. There was other evidence to support the trial court's findings. We conclude the trial court did not err by determining that Defendant's evidence was not credible or otherwise had any impact on his decision to murder his parents.

Defendant takes issue with the trial court's "myopic focus on the" murders committed by Defendant. We note that the trial court did not focus *exclusively* on the murders but considered other evidence concerning Defendant when determining the appropriate sentence. In any event, we conclude that it was not error for the trial court to give significant consideration to the circumstances of the murders themselves. Indeed, a major focus of the analysis by the United States Supreme Court in the cases cited above in determining the appropriateness of a LWOP sentence is on whether the "crime" committed by the juvenile offender "reflects irreparable corruption." *Jones*, 141 S. Ct. at 1315 (citations omitted).

In sum, the sentencing judge considered the evidence presented concerning mitigating factors, including those enumerated in the sentencing statute. We conclude that the trial court complied with N.C. Gen. Stat. § 15A-1340.19B in sentencing Defendant.

B.      North Carolina Constitution – Article I, Section 27

Defendant contends the trial court violated his rights under Article I, Section 27 of our state constitution, a provision which prohibits "cruel and unusual

punishments," in sentencing him to two consecutive sentences of LWOP.  N.C. Const. art. I, § 27.

Our Supreme Court recently held that this state constitutional provision "offers protections distinct from, and in [the context of sentencing juvenile offenders] broader than, those provided under the Eighth Amendment" of the federal constitution.  *State v. Kelliher*, 381 N.C. 558, 579, 873 S.E.2d 366, 382 (2022).  Further, the Court held that "sentencing a juvenile who can be rehabilitated to [LWOP] is cruel within the meaning of article 1, section 27."  *Id.* at 585, 873 S.E.2d at 386.  The Court reiterated this principle in another opinion decided the same day.  *See Conner*, 381 N.C. 643, 669, 873 S.E.2d at 355-56 (2022) (holding that sentencing a juvenile offender whom the court finds not to be "incorrigible or irredeemable" to LWOP violates "the even more protective provisions of article 1, section 27" of our state constitution).

In both *Kelliher* and *Conner*, the sentencing judge found the juvenile offender *not* to be permanently incorrigible.  Our Supreme Court held in each case that it was a violation of our state constitution to sentence a juvenile offender to LWOP where the sentencing court found the offender *not* to be permanently incorrigible.  However, here, the sentencing judge made no finding that Defendant was not permanently incorrigible.  Rather, the trial court expressly found that "it did not believe that there is a likelihood of rehabilitation in confinement" and that Defendant's crimes "demonstrate a condition of irreparable corruption and permanent incorrigibility."

In what is arguably *dicta*, our Supreme Court further stated in *Kelliher* and *Conner* that even if the trial court does not find the juvenile offender not to be permanently incorrigible, the Court considered it a violation of our state constitution for a judge to sentence a juvenile offender to LWOP unless the judge affirmatively found the offender permanently incorrigible. *See, e.g., Kelliher*, 381 N.C. at 587, 873 S.E.2d at 387 (noting that "unless the trial court expressly finds that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated, he or she cannot be sentenced to [LWOP]" under our state constitution). That is, where the federal constitution does not require an express finding by a sentencing judge that the juvenile offender is or his crime reflects permanent incorrigibility, *see Jones v. Mississippi*, *supra*, our Supreme Court expressed the view that such a finding is required under our state constitution.

However, even if these statements in *Kelliher* and *Conner* are not *dicta*, we conclude the trial court complied with the holding when it expressly found that there was no likelihood that Defendant would be rehabilitated during confinement. Accordingly, we conclude the trial court did not violate Defendant's rights under our state constitution in sentencing him to two consecutive sentences of LWOP for the murder of his parents.

## III.    Conclusion

The trial court did not err in sentencing Defendant to two consecutive sentences of LWOP.  We, therefore, conclude Defendant received a fair trial, free of reversible error.

NO ERROR.

Judge GORE concurs.

Judge Arrowood dissents by separate opinion.

No. COA22-985 – *State v. Borlase*

ARROWOOD, Judge, dissenting.

I respectfully dissent from the majority's holding that the trial court did not err in sentencing defendant to two consecutive sentences of life without the possibility of parole. The majority's opinion not only misreads the record, but it also ignores and calls into question our Supreme Court's precedent regarding a sentencing judge's "duty to find a statutory mitigating factor when the evidence in support of a factor is uncontradicted, substantial and manifestly credible." *State v. Spears*, 314 N.C. 319, 321 (1985) (citing *State v. Jones*, 309 N.C. 214, 219–20 (1983)). This duty of the trial court "is at the heart of the factfinding function[,]" and by allowing the trial court to ignore credible evidence, the majority renders meaningless the requirement that it consider the statutory factors under N.C.G.S. § 15A-1340.19B. *Jones*, 309 N.C. at 219–20.

Such blatant disregard for precedent demands justification, but the majority offers none. Instead, it wrongly concludes that the sentencing judge considered the evidence presented and complied with the statute. Moreover, rather than acknowledge defendant's evidence, the majority concentrates on excusing the trial court for its "significant consideration" of the crime when sentencing defendant— "despite the fact that the case law warns against such a focus[.]" *State v. Ames*, 268 N.C. App. 213, 225 (2019). In the process, the majority diminishes longstanding

concerns surrounding the sentencing of juveniles and the importance of "considering an offender's youth and attendant characteristics before imposing a life-without-parole sentence." *Miller v. Alabama*, 567 U.S. 460, 483 (2012) (cleaned up).

I would vacate and remand for resentencing because the trial court violated N.C.G.S. § 15A-1340.19 as well as its duty under *Jones* in the face of credible evidence alone. However, by refusing to consider relevant mitigating evidence—despite such evidence being manifestly credible under North Carolina law—the trial court also violated defendant's constitutional rights under the Eighth Amendment and Article 1, Section 27 of the North Carolina Constitution.[1] *See Eddings v. Oklahoma*, 455 U.S. 104, 104 (1982).

The majority implies defendant murdered his parents because they took "his car keys and cell phone" and "prohibit[ed] him from participating on the school's track team[.]" The record before us, however, tells a much different story.

## I.    Background

Defendant's convictions arise from the killing of his parents in spring of 2019 at the family's home in Deep Gap, a remote area near Boone, North Carolina. At the time, defendant was seventeen years old and a senior in high school. Defendant's parents had eight children, four biological and four adopted. Defendant was the

---

[1] Because "our Supreme Court 'historically has analyzed [Eighth Amendment] claims by criminal defendants the same under both the federal and state Constitutions[,]' " my analysis applies to both. *See State v. Seam*, 263 N.C. App. 355, 365 (2018), *aff'd*, 373 N.C. 529 (2020) (quoting *State v. Green*, 348 N.C. 588, 603 (1998)).

2

youngest of the biological children. The addition of the adopted children created many challenges for the family. Two of defendant's adoptive siblings had to leave the household due to family conflict. Specifically, one was sent to a psychiatric hospital before permanently ending up in foster care while another was sent to a home for troubled children in Missouri.

Defendant's parents were described as loving and committed to their children. They were also deeply religious, particularly defendant's mother. These religious views strained defendant's relationship with his mother and became a source of conflict. Defendant described discipline in the household as harsh. Defendant testified to being awakened in the middle of the night by his mother sometimes as many as "four out of five school nights[,]" so his mother could lecture him on religion, school, and girls for several hours. Defendant's adoptive siblings also described being awakened by their mother and taken to a place referred to as "the nest"—the place in the house where these late-night confrontations occurred. Some of these conflicts lasted several hours and escalated to screaming.

Before relocating to Deep Gap, the family lived in Mooresville, North Carolina. In 2017, the family physically separated when defendant's mother and two of the siblings moved to Deep Gap, leaving defendant, defendant's father, and another sibling in an apartment in Mooresville.

At the end of defendant's junior year, they joined his mother and siblings in

Deep Gap, where the home was unfinished and not yet approved for occupancy. At one point, defendant testified that out of fear that building inspectors would discover them living in the structure, the family took down or moved everything in it that made it "look[ ] like people were living inside." Defendant testified that during this period, his sleeping arrangements varied from staying with his grandmother to sleeping in his car or a goat pen that was on the property.

Although athletically gifted and highly intelligent, defendant struggled academically. He was frequently absent or late to class and failed to finish assignments. While in class, defendant would listen to music and not pay attention. During his senior year of high school, defendant testified to frequently using marijuana and nicotine and having sex with multiple partners. In 2018, defendant was suspended from school after being found with a knife during a search for vaping paraphernalia by school administrators. That same month, defendant participated in outpatient counseling "due to concerns regarding poor judgment and impulsive decision-making within the home and school environments[.]" Moreover, defendant suffered from depression and anxiety. Before his arrest, he engaged in self-harm by cutting his forearms. He also testified to contemplating suicide and attempting it in 2018.

On 10 April 2019, defendant's English teacher called defendant's mother because defendant "wasn't turning in a lot of assignments and . . . was having a hard

time staying awake in class." In response to the call, defendant's parents pulled defendant out of class. The majority suggests that because it was discussed in his civics class that day that juveniles could not receive the death penalty for murder, the lecture somehow fueled defendant's actions. This suggestion has no support in the record and is mere speculation—in fact, the record reflects defendant's lack of attention and interest in the classroom, specifically on the day of the civics class lecture.

After his parents picked him up from school, defendant testified that they went home and discussed his shortcomings, such as being tardy "almost 30 . . . out of . . . 40-some days of school[,]" and his risk of not graduating high school. At some point, defendant's mother had him take a drug test. Defendant and his father then went to Lowe's Home Improvement to purchase mulch. After the three of them completed some household chores, surveillance cameras, which defendant had helped his father install around the home, showed defendant's father walking toward his truck in the driveway to start unloading pallets of mulch at 6:31 p.m. One minute later, defendant was seen walking out of the home toward the driveway before returning to the door and reentering the house.

According to defendant, his father had asked him to help him with the mulch, but his mother told him that he "needed to figure out some stuff for school." While defendant sent an email to a teacher regarding his class performance, which was

dictated by his mother, defendant testified that they started arguing about religion. When he was at the table typing another email, defendant stated that the argument intensified to a point where he said, "Fuck you, that's not what Christianity is about." According to defendant, his mother stated that he "was about to be talking to God or Jesus, whether [he] wanted to or not" before putting her arm around his neck and applying pressure.

Defendant testified that he responded by twisting around and elbowing her, after which, his mother retrieved a pair of scissors and approached him. Defendant stated that he then grabbed a kitchen knife and stabbed her to defend himself but that she kept coming toward him. Defendant testified that while they were pressed up against each other, he stabbed her again in a "reactive frenzy" while he was "trying to get outside[.]" According to the forensic pathologist, her death was caused by stab wounds to her torso. The autopsy results also found that defendant's mother "had been asphyxiated by some type of pressure to the neck prior to death."

At 6:35 p.m., the driveway surveillance camera showed defendant running toward his father in the driveway with a knife and stabbing him in the upper torso. Defendant's father is then seen running away from defendant. Another camera then showed defendant's father running down a hill adjacent to the house while defendant pursued him. While running, defendant's father appeared to trip and fall on the ground, at which point defendant started attacking his father with the knife.

According to defendant, after he went outside, he started yelling for his father "want[ing] to tell him what happened[.]"[2] Defendant recalled colliding with his father in the driveway but not stabbing him at that point. Defendant testified that when running after his father, he saw his father reach for something in his pocket, believing it could have been a pocketknife or phone. Defendant testified, "I was trying to talk to him. And either I was talking or my thoughts were screaming very loudly in my own head, but I thought I was audibly talking and trying to talk to him." Defendant further testified that when he caught up with his father, he started stabbing him. Then, according to defendant, the knife dropped to the ground and defendant's father picked it up after a brief scuffle. In response, defendant testified that he knocked the knife out of his father' hand with a rock before retrieving it and stabbing his father again. The forensic pathologist found that defendant's father died from stab wounds to his torso.

Dr. James Hilkey ("Dr. Hilkey"), defense counsel's expert witness and forensic psychologist, reported that "the encounter between [defendant] and his mother was a highly disturbing and emotionally arousing event; a culmination of years of conflict." The report found that defendant's actions "in killing his father after the assault on his mother was a continuous event and consistent with individuals experiencing a depersonalization/derealization disorder[,]" which involves

---

[2] The surveillance cameras did not record audio.

7

"experiences of unreality or detachment with respect to surroundings[.]"

Defendant testified that, after killing his father, he went back to the house and vomited in the toilet before returning to his father where he got the knife and his father's phone and wallet. From 6:41 to 6:56 p.m., surveillance footage showed defendant retrieving the knife, hosing down the front porch, and dragging his mother into the driveway. Although there is no surveillance footage, defendant testified that he loaded his mother's body in the back a truck, covered her with a blanket, and drove the truck toward the barn. According to defendant, he then took a shower, packed some clothes, and at some point, covered his father's body with a hammock and leaves.

Around 8:30 p.m., defendant picked up his younger brother from their grandmother's house and brought his brother back to the house. When defendant's brother asked him where his parents were and why there was blood in the house, defendant told him that their parents were in Wilkesboro and that the blood was from him cutting himself while doing dishes. After telling his brother to go upstairs and play video games, defendant drove to the high school to see friends and smoke marijuana. Defendant testified that after leaving the school, he went to pick up his other brother from work, but his brother had already left. Defendant then drove back to the house, but upon seeing several cars in the driveway, he left and ultimately ended up staying the night with a friend after telling her he had gotten into an

8

argument with his family.

In the morning, defendant told his friend that he wanted to run away, so they left her apartment, got some breakfast at McDonalds, and purchased some toiletries and a pillow at Walmart. The friend told defendant that he could stay at her father's house who lived nearby in Tennessee and defendant agreed. As they crossed the border into Tennessee, police pulled the car over and arrested defendant.

Defendant was indicted with two counts of first-degree murder on 30 September 2019 to which defendant later entered pleas of not guilty. On 2 March 2022, a jury found defendant guilty on both counts of first-degree murder.

Pursuant to N.C.G.S. § 15A-1340.19, a sentencing hearing was held on 3 March 2023. During the hearing, the trial court first allowed the State and family members to be heard. In addition to family members providing victim impact statements, the State introduced letters from other family members and two written statements that were previously read in court. The State concluded with the following statement:

> Your, honor, I will just say very briefly, I don't have the words to express what this family has been through. They have articulated it much better than I ever could. I will say, Your Honor, over the three years that this case has been pending, I and my staff have been truly honored and humbled to get to know them, to see the resilience and strength of this family. The way they have come together and supported one another in this loss has been truly inspiring for I and my staff, Your Honor, and I think that that along with the words that they've expressed here

> today truly shows the Court what kind of people that Jeff
> and Tanya were and what their family was all about.
>
> Your Honor, this community, this family has lost – has
> suffered an incomprehensible loss. On behalf of the State
> of North Carolina, Your Honor, given the gravity of this
> loss and all the other evidence that this Court has heard
> over the course of this trial, we would argue that the weight
> of the evidence, the weight of this loss would overcome any
> mitigating factors that the defense might present, and that
> the sentence for [defendant] should be life without the
> possibility of parole for the death of Tanya Maye Borlase
> and another sentence of life without the possibility of
> parole in the death of Jeffrey David Borlase, and that those
> two sentences should run consecutively, Your Honor.
> Thank you.

Defendant then introduced several sentencing exhibits, including (1) Dr.

Hilkey's trial report; (2) Dr. Hilkey's report of psychological forensic evaluation

addressing §15A-1340.19's mitigating factors; (3) a letter from Susan Schall ("Ms.

Schall"), defendant's 11th grade Honors English teacher; (4) a letter from Cindy

Wilkinson ("Ms. Wilkinson"), a mother who had spent a week as defendant's group

leader during a church camp in 2017; and (5) a letter from Rachel Chrane regarding

defendant's health issues. Defendant provided copies of the exhibits to the State.

Dr. Hilkey's trial report described a strict, chaotic household and a highly

dysfunctional relationship between defendant and his mother. Specifically, the

report included an interview with defendant's sibling, who described being

"summoned to 'the nest' " and lectured to "for hours at a time and at times until 3:00

in the morning." The sibling stated that "punishments delivered were often done in

isolation and away from other siblings." Dr. Hilkey's report additionally explained that due to defendant's "emotionally reserved nature and his discomfort expressing strong emotions[,] he can come across to others as calloused and unfeeling."

The report also included an interview with defendant's ex-girlfriend who stated that she "often hear[d] defendant's mother screaming while she was on the phone with [defendant and had informed the investigator] that [defendant's] mother was very strict and did not feel [defendant] could 'do anything right.' " She further stated that "[t]oward the end, [defendant] quit trying to please and just wanted to make it through each day."

Additionally, the report described a "deeply religious" household where defendant reported that his mother "held to a literal translation of the Bible." According to defendant, it was "not uncommon for his mother to reference receiving instructions from God and removing African and West Indian objects of art from the home believing they were demonic, and at times, screaming at them."

Lastly, the report described significant conflicts between defendant's parents and adoptive siblings, including the removal of two of the siblings from the family. It was reported that before one was removed to a group home, the sibling had attacked his brother, grandmother, father, and mother.

In the letter from Ms. Schall, she described conversations she had with defendant about his "strict religious upbringing" and him "feeling confined by his

family's choices and values." In 2018, Ms. Schall was asked to write a letter about

defendant to the high school administration. In the letter, Ms. Schall states:

> Currently [defendant], his dad, and one adopted brother
> live in an apartment in Mooresville (his parents just sold
> their home this semester) while his mother and the rest of
> the children live in Boone. This arrangement is partly due
> to the Borlases building a house in Boone . . . and because
> [defendant's] brother is so violent that his mother cannot
> live with him until they work out some issues. This puts
> an undue burden on [defendant] to help parent his
> brother.[3]

Moreover, when interviewed by Dr. Hilkey, Ms. Schall reported that defendant "was

frequently late for class and appeared physically fatigued." Defendant related to her

"chaos in the home, separation of family members, and [moving] concerns[.]"

In Ms. Wilkinson's letter, she described a time during church camp in Myrtle

Beach in 2017 where she was defendant's small group leader. According to Ms.

Wilkinson, she learned that defendant was sent to the weeklong camp "with only a

pair of shorts and a tee shirt" as punishment. In response, Ms. Wilkinson purchased

some clothing and toiletries for defendant from Walmart. Ms. Wilkinson "sensed that

he needed mothering and felt his emotional rawness and talked through some of the

pain privately and in the group." Ms. Wilkinson further stated that defendant "was

in despair and showed multiple signs of suicide risk: depression, sense of

---

[3] The omitted portion consists of a note Ms. Schall added in a email excerpting the letter. The note is as follows: **{I now know they were renovating a home. [Defendant] told me on more than one occasion that it was illegal for them to be living in the home due to the lack of upgrades, electrical and otherwise}.**

12

hopelessness, despair, withdrawal, isolation, worthlessness, saw no way out, fatigue, confusion, and talked about how broken he felt in group time."

Finally, Dr. Hilkey's report of psychological forensic evaluation, which addressed the §15A-1340.19's mitigating factors, stated that although defendant's parents "were law-abiding parents and attempted to provide a safe home consistent with their moral values[,]" defendant's "offense behavior was influenced by [his] conflicted relationship with his mother[.]"

After defense counsel and defendant made their closing statements regarding sentencing, the State declined to make any further argument. In the sentencing order, the trial court concluded that "[d]efendant's crimes and condition reflect a condition of irreparable corruption and permanent incorrigibility without the possibility of rehabilitation" and sentenced defendant to two terms of life without the possibility of parole. Defendant gave oral notice of appeal in open court following sentencing.

## II.    Discussion

On appeal, defendant argues that the trial court erred by sentencing him to two consecutive life without parole sentences. With regard to the trial court's findings on the mitigating factors enumerated in N.C.G.S. § 15A-1340.19B(c), defendant challenges six of them for either failing to establish whether the factor was mitigating or failing to find mitigating factors despite evidence that they existed. Defendant

also argues that the trial court violated defendant's constitutional rights because it "refuse[d] to consider" relevant mitigating evidence in violation of the Eighth Amendment. Before addressing each argument in turn, I first review federal and state law on the punishment of juvenile offenders.

A. Statutory and case law on the punishment of juvenile offenders

In *Miller v. Alabama*, the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " 567 U.S. at 465. "Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476. Thus, "the case for retribution is not as strong with a minor as with an adult" because their "culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Roper v. Simmons*, 543 U.S. 551, 571 (2005).

The Supreme Court also stated in *Miller* that because of "children's diminished culpability and heightened capacity for change," sentencing juveniles to life without parole will be an uncommon occurrence. 567 U.S. at 479. This is especially the case "because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id.* at 479–80,

183 (citations omitted); *see also Graham v. Florida*, 560 U.S. 48, 72 (2010) (explaining that "[t]o justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is [permanently] incorrigible.").

Thus, in making such rare finding, "the trial court should be satisfied that in 25 years, in 35 years, in 55 years—when the defendant may be in his seventies or eighties—he will likely still remain incorrigible or corrupt, just as he was as a teenager, so that even then parole is not appropriate." *State v. Sims*, 260 N.C. App. 665, 683 (2018) (Stroud, J., concurring); *see also State v. James*, 371 N.C. 77, 96–97 (2018) ("*Miller* and its progeny indicate that life without parole sentences for juveniles should be exceedingly rare and reserved for specifically described individuals[.]").

Moreover, "almost all of the cases" subjecting juveniles to a sentence of life without parole "arose from heinous and shocking crimes[.]" *State v. May*, 255 N.C. App. 119, 130 (2017) (Stroud, J., concurring). However, *Miller* and its progeny "dwell[ ] on the danger in focusing the sentencing inquiry on the nature of the offense." *State v. Ames*, 268 N.C. App. 213, 221 (2019) (citing *Miller*, 567 U.S. at 472); *see also Roper*, 543 U.S. at 553 ("An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course[.]").

Nine years after *Miller*, in *Jones v. Mississippi*, the United States Supreme Court held "that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." 209 L. Ed. 2d 390 (2021). Although parts of *Jones* could be seen as in conflict with *Miller*, our Supreme Court clarified *Jones*'s meaning in *State v. Kelliher*. 381 N.C. 558 (2022).

Specifically, the *Kelliher* Court explained that although *Jones* does not require a separate finding of incorrigibility "under a discretionary sentencing scheme like North Carolina's[,]" the substantive Eighth Amendment rule announced in *Miller* and its progeny remains undisturbed: *Id.* at 576. *Miller* forbids sentencing courts "from sentencing redeemable juveniles to life without parole." *Id.*

In response to *Miller*, our General Assembly enacted what is now codified as N.C.G.S. § 15A-1340.19B, which requires trial courts to "conduct a hearing to determine whether the defendant should be sentenced to life imprisonment without parole . . . or a lesser sentence of life imprisonment with parole" whenever a juvenile is convicted of first-degree murder. § 15A-1340.19B(a)(2). In determining whether the sentence will be life without parole or life with parole, § 15A-1340.19B requires the sentencing court to consider mitigating factors including (1) age at the time of offense, (2) immaturity, (3) ability to appreciate the risks and consequences of the conduct, (4) intellectual capacity, (5) prior record, (6) mental health, (7) familial or

peer pressure exerted upon the defendant, (8) likelihood that the defendant would benefit from rehabilitation in confinement, and (9) any other mitigating factor or circumstance. § 15A-1340.19B(c).

### B. Mitigating factors under § 15A-1340.19

Regarding the trial court's findings for the factors enumerated in § 15A-1340.19B(c), defendant argues that the trial court erred in that it (1) failed to establish whether defendant's age was mitigating or not and (2) failed to find mitigating factors for defendant's familial pressure and immaturity. I agree.

After the hearing required by § 15A-1340.19B, the trial court must enter a sentencing order that "include[s] findings on the absence or presence of any mitigating factors[.]" § 15A-1340.19C(a). The sentencing court must also "expressly state the evidence supporting or opposing those mitigating factors[.]" *State v. Santillian*, 259 N.C. App. 394, 403 (2018) (citations omitted). "To show that the trial court erred in failing to find a mitigating factor, the evidence must show conclusively that this mitigating factor exists[.]" *State v. Canty*, 321 N.C. 520, 524 (1988) (citing *State v. Michael*, 311 N.C. 214 (1984)).

### 1. Failure to establish whether defendant's age was mitigating

In its sentencing order, the trial court found "that [d]efendant was 17 years and 11 months old on the offense date" and that "[h]e reached the age of adulthood only one month after committing these homicides[.]" Nothing further was stated.

Defendant argues that "the court made no indication that it considered any mitigating value that [defendant's] age might have provided."

North Carolina statute requires that the trial court's sentencing order "include findings on the absence or presence of any mitigating factors[.]" § 15A-1340.19C(a). Here, the trial court violated the statute by neither expressly nor impliedly stating whether defendant's age was mitigating or not. The majority states "it is apparent" from the sentencing order "that the trial court did not consider Defendant's age as a mitigating factor" because it found "[d]efendant was a month shy of his 18th birthday" at the time of the offense. This is hardly the case. Although the trial court's statement that defendant reached the age of adulthood *only one* month after committing these homicides could indicate that it found no mitigating value as to age, it could also mean that it found mitigating value, just not a significant amount. *See Sims*, 260 N.C. App. at 675 (finding that defendant's age—seventeen years and six months at the time of the offense—was not a considerable mitigating factor, but still a mitigating one nonetheless). This ambiguity is insufficient to satisfy the requirements of § 15A-1340.19C(a).

Certainly, a defendant who is fourteen at the time of an offense may receive more mitigation value for the age factor as compared to if they were seventeen. However, United States Supreme Court precedent makes clear: the relevant distinction is between children and adults, not between defendants who are fourteen

18

and seventeen. *See Miller*, 567 U.S. at 460 ("*Roper* and *Graham* establish that children are constitutionally different from adults for sentencing purposes."); *see also Matter of Monschke*, 197 Wash. 2d 305, 313, 482 P.3d 276, 280–81 (2021) (extending the age range in *Miller* to defendants who are eighteen to twenty years old). Because it is unclear whether the trial court found an "absence or presence of" mitigation with respect to defendant's age, it violated the statutory mandate. § 15A-1340.19C(a).

> 2. <u>Failure to find credible evidence of familial pressure</u>

With respect to the enumerated factor "familial or peer pressure exerted upon the defendant," the trial court's sentencing order states:

> In *Miller v. Alabama*, the majority placed emphasis on the negative family, home, environmental and peer influences a juvenile faced while growing up. The specific situations addressed in that and following cases included growing up exposed to a troubled childhood, lack of parental care and involvement, exposure to drugs and even violence. This would also include a situation in which the juvenile was not the "trigger-man" or his involvement in the killing was only tangential. None of the factors are present in this case. In fact, the very opposite is true. Defendant had the benefit of very loving, caring and nurturing parents. He benefited from being raised by parents who deeply loved him and all his siblings and who sacrificed beyond even reasonable measure to provide for their children's health, welfare, happiness, needs and even wishes. While the Defendant may have genuinely disagreed with the form of discipline (*taking of privileges and interactive discussions*), even he seemingly admits in his testimony that both his parents had his best interests and his very future at heart throughout. As to any tangential involvement in murders, that is clearly not the case here. Defendant killed both parents separately by his own hand. *There is no credible*

> *evidence before the Court to support any finding of mitigation as to this factor*[.] (emphasis added).

Defendant argues the trial court erred in finding "no credible evidence" to support this mitigating factor and in relying "on the fact that [defendant] was raised in a loving home[.]"

Our Supreme Court has established that the sentencing judge has a duty to find statutory mitigating factors when the evidence in support of such factors is "uncontradicted, substantial and manifestly credible." *Spears*, 314 N.C. at 321 (citation omitted). Thus, to give proper effect to § 15A-1340.19B, "we must find the sentencing judge in error if he fails to find a statutory factor when evidence of its existence is both uncontradicted and manifestly credible." *State v. Jones*, 309 N.C. 214, 220 (1983).

In *Jones*, our Supreme Court acknowledged that "[i]t is easier to determine from a record on appeal whether evidence of a particular fact is uncontradicted than it is to determine" the credibility of the evidence. *Id.* However, the *Jones* Court discussed situations in which courts have considered "credibility to be manifest[.]" *Id.* Two of those situations occur (1) when "the controlling evidence is documentary and [the] non-movant does not deny the authenticity or correctness of the documents[,]" and (2) when "there are only latent doubts as to the credibility of oral testimony and the opposing party has failed to point to specific areas of impeachment

20

and contradictions." *Id.* (citations and internal quotation marks omitted).

Here, defendant offered considerable evidence of familial pressure, conflict, and dysfunction that went well beyond the "taking of privileges and interactive discussions[,]" particularly with respect to religion. Such evidence included but was not limited to (1) defendant being summoned to "the nest" in the middle of the night multiple days out of the week; (2) defendant's mother screaming at art objects in the home in front of defendant because she believed they were demonic; (3) defendant needing to sleep in his car or in a goat pen because of the family's chaotic living arrangement; (4) reports of significant familial conflicts with his adoptive siblings, which involved violence at times and put an undue burden on defendant to help parent his siblings; (5) reports of defendant being sent to a weeklong church camp without a change of clothes or toiletries as a form of punishment; and (6) Dr. Hilkey's report that defendant's "offense behavior was influenced by [his] conflicted relationship with his mother[.]" Defendant's evidence also tends to support that defendant was regularly pressured by his mother in that he felt he could not "do anything right" and "just wanted to make it through each day."

Such evidence was not contradicted by the State. Specifically, nothing in the State's evidence spoke to these conflicts or pressures, and after defendant introduced such evidence for sentencing, the State declined to make any further

argument. Moreover, under *Jones*, defendant's evidence is presumed credible. Specifically, the evidence was largely documentary, and the State did not deny the authenticity or correctness of the reports or letters.[4] Although the State's evidence supports the fact that defendant's parents loved and cared about him deeply—love and conflict are not mutually exclusive; rather, both can exist in a family simultaneously. Although the majority cites this evidence, such as defendant's idolization of his father, the majority again fails to highlight anything that refutes or contradicts the substantial evidence of familial conflict discussed in part I.

Further, nothing in *Miller* states that a defendant must lack parental care or be exposed to violence and drugs for the mitigating factor to have value, which the trial court's sentencing order wrongly suggests. Rather, *Miller* considers "the family and home environment that surrounds [the defendant]—and from which he cannot usually extricate himself—no matter how brutal *or dysfunctional.*" *Miller*, 567 U.S. at 477 (emphasis added).

"When evidence in support of a particular mitigating . . . factor is uncontradicted, substantial, and there is no reason to doubt its credibility, to permit the sentencing judge simply to ignore it would eviscerate" the statute. *Jones*, 309 N.C. at 218–19. Accordingly, the trial court erred in ignoring the evidence of familial

---

[4] Nor did the State "point to specific areas of impeachment and contradictions" with respect to defendant's oral testimony about being awakened in the middle of the night by his mother sometimes as many as "four out of five school nights" or needing to sleep in a car or goat pen as the result of the family's dysfunctional living arrangement. *Jones*, 309 N.C. at 220.

disfunction and the mother's irrational behavior while finding no credible evidence

regarding the familial pressure exerted upon defendant.

### 3. Failure to find credible evidence of immaturity

With respect to the enumerated factor "immaturity," the sentencing order

states:

> Dr. Hilkey's report cites various general studies tending to indicate that the juvenile brain tends to develop slowly and that the brain does not become fully developed until later in adulthood.  While undoubtedly true, there is no credible, specific evidence before the Court that Defendant suffered from any specific immaturity that would act to mitigate his decisions and conduct in this case.  Accordingly, the Court does not find this factor to be a significant mitigating factor in this case[.]

Defendant argues that the trial court erred in this finding because there was

"credible, specific evidence before the Court that [d]efendant suffered from . . . specific

immaturity that would" have mitigated his decisions.

Here, Dr. Hilkey's report stressed that because defendant was only "seventeen

on the date of his offense . . . the frontal cortex of his brain was not yet fully

developed."  Additionally, Dr. Hilkey reported "evidence supporting [defendant's]

clinical depression and a significant degree of physiological arousal . . . activating

hormonal chemicals in [his] brain.  When coupled with the adolescent brain

phenomenon, these factors would have impacted his ability to make sound decisions

and fully appreciate the impact of his behaviors when he killed his parents."

Defendant's previous participation in outpatient counseling "due to concerns regarding poor judgment and impulsive decision-making within the home and school environments" corroborate Dr. Hilkey's findings regarding immaturity. *See Miller*, 567 U.S. at 471 (explaining that children's "lack of maturity and underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless risk-taking." (cleaned up)). Defendant's "shirking class time on his phone, vaping and smoking weed, and [being] sexually active with more than one partner" acts to further underscore his immaturity.

In addition to being specific, defendant's evidence was credible. In fact, by acknowledging and agreeing with the science of juvenile brain development in its order, the trial court emphasized its credibility. Moreover, the evidence was "documentary[,]" and the State never "den[ied] the authenticity or correctness of [the findings]." *See Jones*, 309 N.C. at 220.

By stating there was "no credible, specific evidence" in its order, the trial court thus disregarded its duty. *See Spears*, 314 N.C. at 321 ("The sentencing judge has a duty to find a statutory mitigating factor when the evidence in support of a factor is uncontradicted, substantial and manifestly credible."). Accordingly, the trial court again erred in finding no credible evidence that defendant suffered from immaturity.

C. <u>Violation of the State and Federal Constitutions</u>

Defendant argues that the trial court violated defendant's constitutional rights

under the Eighth Amendment in that it refused to consider "relevant mitigating evidence" involving his "family life as a source of pressure." I agree.

"Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 104 (1982). In *Eddings*, the trial court refused to consider the mitigating circumstances of the juvenile defendant's turbulent family history because it "found that *as a matter of law* he was unable even to consider the evidence." *Id.* at 113. Because the "sentence was imposed without 'the type of individualized consideration of mitigating factors . . . required by the Eighth and Fourteenth Amendments in capital cases,'" the Supreme Court reversed and required on remand the trial court's consideration of the defendant's home life. *Id.* at 105 (quoting *Lockett v. Ohio*, 438 U.S. 586, 606 (1978)); *see also Jones v. Mississippi*, 209 L. Ed. 2d 390 (2021) (listing a series of its capital cases requiring "the sentencer to consider mitigating circumstances when deciding whether to impose the death penalty.").

Although these cases involved the death penalty, the Supreme Court expressly acknowledged in *Jones v. Mississippi* that these cases

> recognize a potential Eighth Amendment claim if the sentencer expressly refuses as a matter of law to consider relevant mitigating circumstances . . . . By analogy here, if a sentencer considering life without parole for a murderer who was under 18 expressly refuses as a matter of law to consider the defendant's youth (as opposed to, for example,

25

> deeming the defendant's youth to be outweighed by other factors or deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case), then the defendant might be able to raise an Eighth Amendment claim under the Court's precedents.

209 L. Ed. 2d 390 n.7 (2021). I find this analogy relevant because "life without parole sentences share some characteristics with death sentences that are shared by no other sentences." *Graham*, 560 U.S. at 69, 176 L. Ed. 2d 825. Although no execution takes place, "the sentence alters the offender's life by a forfeiture that is irrevocable" and "deprives [them] of the most basic liberties without giving hope of restoration[.]" *Id.* at 69–70.

"Life without parole is an especially harsh punishment for a juvenile[,]" who "will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." *Id.* at 70, 176 (citations omitted). Even more, in the case *sub judice*, the trial court sentenced defendant to two consecutive life sentences. Because "[t]his reality cannot be ignored[,]" *id.* at 71, I agree with defendant that "logic dictates that th[e] Eighth Amendment condition [under *Eddings*] apply with equal force when considering the ultimate punishment for a juvenile."

Here, the trial court refused as a matter of law to consider relevant mitigating evidence when it determined there was "no credible evidence before the Court to

26

support any finding of mitigation as to [the familial pressure] factor." The current edition of Black's Law Dictionary defines "matter of law" as "[a] matter involving a judiciary inquiry into the applicable law." BLACK'S LAW DICTIONARY (11th ed. 2019). As discussed in part II.B., determining whether mitigating evidence is credible involves a judicial inquiry into the law. *See Jones*, 309 N.C. at 220–21; *see also N. Carolina Nat. Bank v. Burnette*, 297 N.C. 524, 533 (1979) (explaining that credibility of the evidence was "manifest as a matter of law."). Specifically, if the "evidence is documentary and the non-movant does not deny the authenticity or correctness of the documents," then courts should deem it manifestly credible. *Jones*, 309 N.C. at 220–21 (cleaned up). Likewise, oral testimony should be deemed manifestly credible if "there are only latent doubts as to [its] credibility . . . and the opposing party has to 'failed to point to specific areas of impeachment and contradictions.' " *Id.* (citations omitted).

Thus, like in *Eddings*, when the trial court here found "no credible specific evidence . . . that [d]efendant suffered from any specific immaturity" or familial pressure that would support mitigation, it expressly declined as a matter of law not to consider it. Yet, as discussed in part II.B., under *Jones*, considerable credible and relevant evidence was proffered by defendant at the sentencing hearing as to both factors.

Accordingly, I would hold that the trial court violated defendant's

constitutional rights under the Eighth Amendment by "refus[ing] to consider, as a matter of law, [the] relevant mitigating evidence" regarding defendant's family life and immaturity. *Eddings*, 455 U.S. at 104. Because our Supreme Court " 'historically has analyzed [Eighth Amendment] claims by criminal defendants the same under both the federal and state Constitutions[,]' " I would also hold that the trial court violated defendant's constitutional rights under Article 1, Section 27 of the North Carolina Constitution. *See State v. Seam*, 263 N.C. App. 355, 365 (2018), *aff'd*, 373 N.C. 529 (2020) (quoting *State v. Green*, 348 N.C. 588, 603 (1998)).

### III.   Conclusion

For the foregoing reasons, I dissent from the majority opinion and would remand for a new sentencing hearing with respect to defendant's first-degree murder convictions.